**STATE of Missouri, Respondent,**

v.

**Wayland Oliver TAYLOR, Appellant.**

No. 56515.

Supreme Court of Missouri,
Division No. 2.

Dec. 13, 1971.

John C. Danforth, Atty. Gen., Thomas D. Vaughn, Asst. Atty. Gen., St. Louis, for respondent.

Robert G. Duncan, Lewis E. Pierce, Pierce, Duncan, Hill & Russell, Kansas City, for appellant.

BARRETT, Commissioner.

Charged with murder in the second degree in shooting Larry Eugene Oliver, a jury found the appellant Wayland Oliver Taylor guilty of manslaughter and fixed his punishment at the maximum, ten years' imprisonment. RSMo 1969, § 559.140, V.A. M.S.

In brief the circumstances were that on July 14, 1970, Oliver and his five adherents, including Philanders Brown, went to Volker Park to "mess around with them hippies." Some days previously Philanders and three or four others had been to the Agee Country Club in Wyandotte County, Kansas, and there became engaged in a rhubarb with another group of boys, chiefly with Taylor's young half-brother, over whether Ricky and his friends had rifled the pocketbooks of two girls at the next table. In the course of the argument all or most of them wound up in the "men's room" and someone, perhaps Philanders, had shoved or slapped Ricky and someone in Ricky's group claimed that a gun had been displayed. Finally the proprietor of the "country club" ejected all the disputants.

Two or three days afterwards Taylor undertook to get an explanation from Philanders as to just what had happened to his brother Ricky. They first had a discussion on July 13th and on the 14th sometime after 7:30 o'clock, they again met in Volker Park, near the Nelson Art Gallery, and again Taylor was examining Philanders as to his encounter with his brother in Kansas. Oliver's adherents, including Philanders, all said that Oliver came up and said, "Well, Philander(s), you don't have to explain anything to him. You explained that to him once." An argument or discussion, depending on one's point of view, between Taylor and Oliver ensued and finally Oliver said, "What do you want to do, do you want to draw pistols?"

Taylor said, "Do you have yours?" Oliver said, "No, I don't have none, but we can fight," whereupon Taylor "reached into his right front pocket * * * pulled out a gun and shot him." The bullet went "through the major artery leading from the heart, the aorta" and, of course, caused Oliver's death. According to Taylor (age 20 and blind in one eye) and his adherents Oliver injected himself into the discussion by saying, "Philanders, you don't have to explain a goddam thing to this nigger. I'll kill this nigger." Whereupon, Oliver "was coming out, you know, he was raising his hand out of his pocket, and I seen a handle of a gun coming up and I jumped, jumped for the pistol, and we were struggling for the gun and I was gaining control of the pistol, and in a brutelike (defined as butting with shoulder and forearm) manner * * * he took me and pushed me back. I had my hand on the pistol and everything by then, he had his hand on the barrel, but he took me and shoved me back, you know, and I fell back off balance and the gun went off and I dropped it and ran."

There are several assignments of error but these briefly detailed circumstances are sufficient to place in proper focus the one problem dispositive of the appeal—the improper, unfairly prejudicial cross-examination of the appellant. Almost casually the prosecutor approached the subject: "By the way, where do you work?" The answer was that he worked at the Broadway Hotel at 12th and Broadway. He was a switchboard operator and desk clerk, had been so employed for a year and a half and on July 14th had worked the shift from seven in the morning until three in the afternoon. It should be interpolated that no one connected with the hotel or its patrons was either a witness or participant in the Volker Park events. After establishing these preliminary facts there were these questions and answers:

"Q. You are not a bellhop?

A. No.

Q. What type of business do they have at the hotel there, is that transient business or do they have people stay there, use that as their residence?

A. We have got tenants that stays in there.

Q. You have tenants that stay there all the time?

A. Yes.

Q. Do you also have people who come in just for one night?

A. Yes, truck drivers.

Q. *Do you have people who come in just for a part of a night?"*

Anticipating, defense counsel, out of the jury's hearing, objected that state's counsel was "attempting to get into an area that is totally irrelevant and immaterial in this case, certainly trying to bring in prejudicial matters, trying to point out that this is a brothel, why (sic) that may be true, this has nothing to do with this case, doesn't go to this man's credibility—." The prosecutor interjected, "Your Honor, I think the fact that he does work there and the fact it is a well known brothel, the fact that he himself has been convicted (under a city ordinance) once of solicitation, *goes to his moral character*, and that, of course, is always an issue as to credibility, and by putting himself on the stand his credibility is opened up and certainly solicitation and *working in an area of prostitution goes to his moral character."* Defense counsel said that he had not been convicted of a crime, "He has been convicted of a violation of a municipal ordinance." Again state's counsel said, "Well, I'm not talking about a crime, *I'm talking about an immoral act,* which does go to credibility." (Emphasis supplied.) There were numerous other objections and colloquies between court and counsel and even a recess in which the court considered the problem. At one point the prosecutor again said, "It is my intention to show that this hotel is used as a brothel and I'm going to ask him if he aids or assists prostitutes that work there." It is not necessary to state the court's reasons,

the court overruled all objections, refused requests to discharge the jury and overruled the objections in appellant's motion for a new trial. And now, excerpting and omitting objections, this was the cross-examination:

"Q. My next question was, 'Do you have any tenants who come in just for a part of a night?'

A. Yes, off and on.

Q. And these tenants who come in for just a few hours, are they both men and women?

A. Yes.

Q. And as a matter of fact, many of these women who come in there are prostitutes, is that correct?

A. No.

Q. That is not correct?

A. No.

*    *    *    *    *    *

A. May I hear the question again?

Q. Yes. I said, isn't it true, in fact, that the women who come in there, most of them are prostitutes?

A. Most of them are prostitutes, is that what you said?

Q. Yes.

A. No.

Q. All right. Let me rephrase that. Have you ever known of a prostitute to come in there?

A. Yes.

Q. And they ply their trade in your hotel, is that correct?

A. 'They apply their trade?'

Q. Yes, they use the rooms at the hotel for prostitution?

*    *    *    *    *    *

Q. All right. So I don't believe you have answered my question. Do they use the rooms in that hotel for prostitution?

A. Does they use them?

Q. Yes.

A. I have no idea what they do, really.

Q. All right. *Have you ever assisted a prostitute in that hotel—?*

*    *    *    *    *    *

A. Have I ever assisted?

Q. *Yes, by helping her find a date or lining up a date or trick or whatever it is called?*

A. No.

Q. You have never done that?

A. No."

As stated, the charge and trial concerned a homicide in Volker Park, there was no charge of pandering or prostitution or of any offense relating to prostitution and no one connected with the hotel, guest, prostitute, employers or employees, was a witness or had any connection with the killing of Oliver. The state now concedes that the questions were irrelevant and immaterial but urges that all this line of cross-examination was not prejudicial and that appellant has failed to demonstrate its prejudicial effect. The state's claim, however, is refuted by the prosecutor's plain statement to the court that all this "goes to his moral character," repeatedly, he said, "working in an area of prostitution goes to his moral character." And again, "I'm not talking about a crime, I'm talking about an immoral act, which does go to credibility." While the prosecutor had said that he was going to prove an offense of solicitation—no such evidence was offered. And the only thing in the record to show that the hotel was a brothel was the unsworn statements of counsel. Against the assertion of no showing of prejudice is the

fact that while appellant was found guilty of manslaughter the maximum penalty of ten years' imprisonment was inflicted.

It is not necessary to go into the general rules as to the impeachment of witnesses, (RSMo 1969, §§ 491.050, 546.260, V.A.M.S.) convictions for violations of city ordinances, proof of separately charged offenses (40 Am.Jur.2d Homicide, § 310, p. 579; State v. Hyde, 234 Mo. 200, 136 S.W. 316) or proof of specific acts of misconduct to impeach a witness or a party. These questions were all directed to the defendant on trial for murder, they plainly implied that he was guilty not only of moral misconduct but of some offense connected with prostitution—even that he, in addition to other offenses relating to prostitution, was a pimp. This line of cross-examination was not only immaterial and irrelevant it was designedly and manifestly prejudicial, plainly an infringement of a fair trial for which the only remedy is a new trial. A case almost squarely in point is State v. Taylor, 98 Mo. 240, 11 S.W. 570. There in 1889 a conviction for assault with intent to kill was reversed because the state introduced "in evidence the original record of defendant's conviction of the violation of a city ordinance in frequenting a bawdy-house." And see in the same connection illustrating the general rules and their exceptions State v. Cole, Mo., 213 S.W. 110; State v. Negron, Mo.App., 374 S.W.2d 622; State v. Spinks, 344 Mo. 105, 125 S.W.2d 60; State v. Atkinson, Mo., 293 S.W.2d 941. Accordingly, the judgment is reversed and remanded.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

All of the Judges concur.