STATE of Missouri, Respondent,

v.

Jeffrey Lane TOKAR, Appellant.

No. 76225.

Supreme Court of Missouri,
En Banc.

March 26, 1996.

Rehearing Denied April 23, 1996.

Randall J. Schlegel, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, David B. Cosgrove, Assistant Attorney General, Jefferson City, for respondent.

PRICE, Judge.

A jury convicted Jeffrey Tokar of first degree murder and recommended that he be put to death. The trial court agreed and entered a sentence of death. Subsequently, the motion court overruled Tokar's Rule 29.15 motion. Appeals from both judgments were consolidated. This Court has jurisdiction. *Mo. Const. art. V, § 3.* The conviction, sentence, and denial of post-conviction relief are affirmed.

## I.

Around noon on March 11, 1992, Jeffrey Tokar picked up his girlfriend, Sandra Stickley. Stickley smoked crack cocaine and Stickley and Tokar shared some beer. Then they went driving in a rural area north of Centralia to find a place where nobody was home. Tokar and Stickley located the empty Douglass residence. After parking in the

driveway, Tokar took his socks off, placed them on his hands to avoid leaving fingerprints, and went inside the garage. He later returned with a shotgun and shells he had found in the home, motioning for Stickley to come in.

Eight-year-old Jarad Douglass, four-year-old Lynzie Douglass, and their father, Johnny Douglass, returned to their home during the late afternoon. They had been checking on cattle down the road from the family's home. Upon arriving at their house, they noticed a yellow station wagon in their driveway. Jarad had mentioned earlier that he saw a yellow station wagon driving towards their home. Johnny told his children to stay in the truck as he went into the garage to investigate. However, Lynzie decided to follow her father anyway, calling her brother a "chicken" as she left the truck. At some point, Jarad also left the truck and went to look into the garage.

As the Douglass family was returning home, Tokar and Stickley were ransacking the Douglass home and stuffing items into empty pillowcases. Stickley warned Tokar that she heard someone pull into the driveway. Tokar loaded the shotgun and went toward the garage where he met Johnny Douglass. Stickley testified that she heard one of the kids say "Mister, please don't hurt my daddy." She also heard Johnny himself plead: "Mister, please don't hurt me. I'll do anything you say." She further explained that Tokar told Johnny not to look at him. She heard one shot and then a second shot.

Both Tokar and Stickley ran to the car and threw the shotgun in the backseat. As they sped away, Tokar wiped down the gun with his shirt, and took a shell out of the gun. Tokar stopped to throw the gun and shell into a nearby farm pond. Meanwhile, Jarad ran to a neighbor's house. That neighbor called 911 and took the two children to their grandparents' house.

When the police arrived on the scene, they found Johnny in a pool of blood on the garage floor. He had been shot once in the face and once in the back of his head. One of the detectives determined, based on the blood spatter evidence at the scene, that the victim was low to the ground, or bent over,

when the second shot was fired. There was also a bloody shoe imprint, which later proved to be consistent with, though not definitive of, Tokar's tennis shoes upon arrest. The police found electronic equipment piled on a table and pillowcases stuffed with silverware, clothing and cosmetics. They also recovered a box of .410 shotgun shells, but Johnny Douglass' shotgun was not found in the house. About five days later, the shotgun was found at the bottom of a nearby farm pond and the shell was found floating on the pond. Stickley had informed the police that Tokar had thrown the shotgun into a pond near the road after the shooting.

Later that evening Tokar told Stickley, "Sandy, I did kill this man ... I shot half the side of his face off and then when he started to get back up I blowed the back of his head off." He also told Stickley, "I should have killed the kids so no one could testify and say that we were there."

Tokar and Stickley were arrested on March 13, 1992. At first, Stickley denied knowing about the burglary and murder, but later confessed to being with Tokar during the incident. Positive post-arrest lineup identifications of Tokar were performed by three individuals, and Tokar was charged with first degree murder.

On March 1, 1993, one week before trial, Tokar made a motion for a continuance at a pretrial hearing. The primary reason stated in support of the motion was a desire by Tokar's attorneys to obtain a further medical examination. Tokar had already been examined by Dr. Cowan, a neuro-psychologist, and Dr. Daniel, a medical doctor specializing in psychiatry. The following colloquy took place (excerpted from entire continuance proceeding):

[Defense counsel]: Judge, there is a belief by Dr. Cowan that there is some psychological disorder with Mr. Tokar. He has suggested, based on his test results, that Mr. Tokar go under psychiatric consultation. Mr. Tokar is HIV Positive, and depending on who you talk to, he either has active AIDS or he's on the verge of having AIDS. Accompanying that medical condition is some form of dementia. By

the psychological testing that we have had conducted, we have reason to believe that perhaps his apparent irrational behavior could be attributed to the HIV virus. We have some concern as to whether or not, given some of his recent statements to us, he is going to be cooperative with defense counsel; and even if he is or makes an effort to be cooperative, whether or not he will be able to effectively assist counsel during trial. Included in our request here today would be for the Court to grant us time to have a complete medical diagnosis and physical performed on Mr. Tokar to determine the extent that the HIV virus has impaired his ability either to reason appropriately or to assist his counsel....

\* \* \* \* \* \*

[Defense counsel]: The last white blood cell count that we obtained on Mr. Tokar revealed a white blood cell count of approximately 350 to 400. In a non-HIV infected individual that count is anywhere from 5,000 to 11,000. Once the count is under 300, I believe, medically it's classified, and I'm not speaking as an expert here, but it is classified as full blown AIDS. Whether he has that condition at this time, again, is a matter of opinion of medical experts. What I think is in question is his ability at this point to reason and to assist counsel. In furtherance of that, we are requesting just a brief period of time until May the 1st to determine the extent that this virus may have impaired his ability and competence to stand trial.

\* \* \* \* \* \*

[The court, addressing Prosecutor]: ... They think that he may not be able to cooperate in his defense, as I understand it.

[Defense counsel]: That is correct, Judge.

[Prosecuting attorney]: But there's no such motion before the Court, there's no testimony to that effect. This is just argument, and there's no proof of that. This is just an assertion without any basis.

\* \* \* \* \* \*

[Defense counsel]: Chapter 552.020 does not—we're not relying on an assertion nor

do we intend to present it. At least on what we know at this point, he was impaired at the time of the offense. Our intention here is, at the present time, Chapter 552 allows the Court at any time it has reason to believe defendant is not fit to proceed to trial, the Court can take the appropriate actions to insure that perhaps at some other date he will be. That's what we're asking for at this time. We're not relying on the affirmative defense of mental disease or defect which I think you were hinting at the time.... It is, also, I believe, relevant, highly relevant to the penalty phase of the case. Aside from the issue as to whether or not he can effectively assist counsel during the trial and his competency to stand trial.

[Prosecuting attorney]: There has been no motion to have him examined. There's been no assertion of any facts which would put the Court on notice and require the Court to have him examined. I submit that this is just a bootleg way to get a continuance by making these assertions. There's no proof in the record of any evidence to warrant the Court in ordering an exam. Apparently, what they want to do is they don't want a court ordered exam to determine whether he's not able to cooperate. They want to have their own doctor state that.

[Defense counsel]: We're looking more for a medical diagnosis rather than a psychological clinical diagnosis in that regard. I assure you that this is not a bootleg attempt to get a continuance. If that was true, we wouldn't have informed the Court that we would be ready to proceed on May the 1st. That does not alleviate our trial schedule. That does not present any kind of better shape regarding the availability of these attorneys to try this case. It is still a hardship but we are doing everything we can. I think that is evidenced by what we have done since we last appeared before this Court, and it is demonstrative of our good faith in trying to prepare for trial. Our concern, and it has been from the beginning, is that we can proceed to trial and give it the best shot we can, and we are constitutionally required to give to

Mr. Tokar and to see that he gets a fair trial. I don't believe a fifty-two day delay is going to prejudice the State at all. It could make a major difference to Mr. Tokar if we get this medical report performed and completed and put before the Court before the trial date.

\* \* \* \* \* \*

[Prosecuting attorney]: But there's no medical evidence that just because a person [has a white blood cell count of] 350 to 400 that that interferes with his mental capacity. They haven't asserted in any way—

[The court]: There's no medical record before the Court to this effect, is there? I haven't seen anything from Dr. Cowan and apparently neither has the State.

[Defense counsel]: Well, I could supply that but—

[The court]: That was the reason he was examined, wasn't it, to find out what his mental state was?

[Defense counsel]: Judge, I have supplied an affidavit to the Court, and I can get an affidavit from Dr. Cowan stating that these are the reasons that he believes psychiatric consultation is necessary.

[The court]: Is there anything else you want to put on the record in the hearing of the state as to your motion for a continuance?

The hearing continued with a discussion of making witnesses available to both sides. The trial judge initially denied the continuance, but on March 5, 1993, the continuance was granted, and the trial was set for May 3, 1993. The defense team never again raised the issue of Tokar's competency to stand trial, nor does the record reveal that the defense submitted any psychological or psychiatric reports to the trial court on this issue prior to trial.

After a three-day trial, the jury returned a verdict of murder in the first degree on May 7, 1993. During the penalty phase of the trial, Dr. Daniel testified on behalf of Tokar in mitigation of factors warranting the death penalty, such as Tokar's alcoholism and childhood sexual abuse. On cross-examination by the prosecutor, Dr. Daniel testified in the following manner:

Q. [Prosecuting attorney]: Is it also your opinion after evaluating all the data, and we won't go through the specifics, but this defendant has an average range of intelligence?

A. [Dr. Daniel]: That is correct.

Q. Average vocabulary?

A. That is correct.

Q. Average reasoning ability?

A. That is correct.

Q. His memory is well-preserved?

A. That is correct.

Q. When you interviewed him and, by the way, this interview, these four separate interviews occurred in February of [1993], did they not?

A. In February and March of [1993].

Q. So, approximately three months [before trial] was the first time that you ever met and interviewed Jeffrey Tokar?

A. That is correct.

\* \* \* \* \* \*

Q. And during these interviews, sir, you were able to at least form and make some observations and form some impressions as a result, did you not?

A. That is correct.

Q. For instance, you found that Mr. Tokar was fully oriented as to the time and place, who you were and why you were there?

A. That is correct.

Q. He did not appear to have any cognitive disturbance, did he?

A. That is correct.

Q. There was no evidence of hallucinations, was there?

A. That is correct.

Q. You saw no perceptual problems, did you?

A. That is correct.

Q. His insight and judgment was [sic] well preserved, in your opinion?

A. That is true.

Q. The bottom line is, Dr. Daniel, that he has the capacity to distinguish right from wrong, doesn't he?

A. That is correct.

Tokar declined to testify at either the guilt or penalty phases of the trial. On both occasions the trial court voir dired Tokar concerning his decisions, during which Tokar responded to the court's questioning in a reasonable manner and gave no indication of any incompetence. During the guilt phase of the trial the following discussion took place:

THE COURT: Mr. Tokar, I want to ask you if you understand that you have the right to testify or not testify in this case?

MR. TOKAR: Yes, I do.

THE COURT: And do you understand that if you choose to testify, you will be subject to cross-examination by the Prosecuting Attorney as would any other witness?

MR. TOKAR: Yes, I do.

THE COURT: Do you also understand that if you choose to testify, the State could ask you about any prior convictions that you may have?

MR. TOKAR: Yes, I do.

THE COURT: Do you understand that if you choose not to testify that upon request of your attorney, I would instruct the jury that under the law the defendant has the right not to testify and no presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify?

MR. TOKAR: Yes, I do.

THE COURT: Do you understand that if your attorney request [sic], I will so instruct the jury?

MR. TOKAR: Yes, I do.

THE COURT: Do you understand that the ultimate decision as to whether you testify or do not testify is your decision?

MR. TOKAR: Yes, I do.

THE COURT: And even though I'm sure your attorney will make some recommendation to you, do you understand you are not required to follow your attorney's recommendations?

MR. TOKAR: Yes.

THE COURT: Do you wish to testify in this case?

MR. TOKAR: No. I've been advised by my attorney not to.

THE COURT: And you wish to follow their recommendation?

MR. TOKAR: Yes.

During the penalty phase of the trial the following discussion took place:

THE COURT: Mr. Tokar, do you understand that you have the same right to testify in this portion of the trial as you had in the first portion of the trial?

MR. TOKAR: Yes, I do.

THE COURT: Do you wish to so testify?

MR. TOKAR: No, I don't.

THE COURT: Do you understand that this decision is your's [sic] alone?

MR. TOKAR: Yes, I do.

THE COURT: And you wish to follow the recommendations of your counsel?

MR. TOKAR: Yes, I do.

The jury sentenced Tokar to death the following day, finding two statutory aggravating circumstances: 1) that the murder in the first degree was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind, per § 565.032.2(7); and 2) that the murder in the first degree was committed while the defendant was engaged in the perpetration of a burglary, per § 565.032.2(11). The trial court denied Tokar's motion for a new trial and imposed the death sentence on August 27, 1993.

Tokar filed a *pro se* motion to vacate his conviction pursuant to Rule 29.15 on May 26, 1994, and his appointed counsel filed an amended motion on July 25, 1994. Tokar himself did not present any testimony on his alleged trial counsel's ineffective assistance during the post-conviction relief hearing on December 12, 1994. The motion court found Tokar's claims to be without merit, and the motion was denied in all respects on February 10, 1995.

The defense obtained a new psychological report on August 28, 1995, well after the post-conviction relief proceedings had been completed. The report generally states that

prior to and during trial, Tokar suffered from severe mental illness and was unable to rationally understand the nature of the proceedings against him. On August 30, 1995, Tokar motioned this Court to supplement the record on appeal with this report.

## II.

### A. Issues on Appeal

On appeal, Tokar alleges ten points of error: 1) that the trial court erred by not ordering a competency hearing before proceeding to trial; 2) that his trial counsel was ineffective for inadequately presenting defendant's mental state to the jury during the penalty phase; 3) that his trial counsel was ineffective for failing to object to his unlawful arrest; 4) that his trial counsel was ineffective for failing to move to suppress the identification evidence against him; 5) that his trial counsel was ineffective for failing to object to prejudicial statements by the prosecutor during the opening statement, and during the guilt phase and penalty phase closing arguments; 6) that the prosecutor's misstatement of law during voir dire was plain error; 7) that the trial court erred by admitting the extremely inflammatory evidence that he has AIDS during the penalty phase; 8) that the trial court erred by submitting the instruction that directs the jury to decide whether the death penalty is warranted, in light of the aggravating circumstances they have found, but before the jury was instructed to consider mitigating circumstances; 9) that the trial court erred by not submitting his proffered instruction that specifically listed nonstatutory mitigating circumstances; and 10) that the trial court erred by submitting the instruction that allows the jury to find an aggravating circumstance if the murder was "vile, horrible, and inhuman." We address each of these arguments below.

### B. Standard of Review

■ In addressing the trial court errors on direct appeal, we review "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. McMillin,* 783 S.W.2d 82, 98 (Mo. banc 1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112

L.Ed.2d 179 (1990). In considering Tokar's points on appeal from the denial of postconviction relief, we make a determination whether the findings of fact and conclusions of law are "clearly erroneous". *State v. Starks,* 856 S.W.2d 334, 336 (Mo. banc 1993).

■ In reviewing claims of ineffective assistance of counsel, we look to whether appellant has established below that his counsel's performance failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Storey,* 901 S.W.2d 886, 900 (Mo. banc 1995); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). To prove prejudice, appellant must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Storey,* 901 S.W.2d at 900; *State v. Shurn,* 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied,* — U.S. —, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). "Strategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. A strong presumption exists that trial counsel was effective and an appellant bears a heavy burden of overcoming that presumption by a preponderance of the evidence. *Amrine v. State,* 785 S.W.2d 531, 534 (Mo. banc 1990), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990).

■ We interpret the facts in the light most favorable to the verdict. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied,* — U.S. —, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

### C. Motion to Supplement Record on Appeal

Tokar has filed a motion requesting our leave to supplement the record with new evidence in the form of an affidavit by Dr. Genia Simmons, Ph.D. Dr. Simmons relied on educational and employment records, prison records, medical and psychological rec-

ords, personal writings of Jeffrey Tokar, the trial and post-conviction relief hearing transcripts, and personal interviews with those who knew Tokar. However, Dr. Simmons did not actually examine Tokar because he refused to see her.

Dr. Simmons concluded that "at the time of his trial, at all times prior to his trial, dating back years before his arrest for the murder of Johnny Douglass, Jeffrey Lane Tokar suffered from severe mental illness in the form of Paranoid Personality Disorder ... [rendering Tokar] unable to rationally understand the true nature of the proceedings against him and to rationally understand the true nature of the roles of the various participants in those proceedings, and that he was incapable of receiving, evaluating, or discussing with his attorneys, with a reasonable degree of rational understanding, their advice concerning his case." Dr. Simmons also concluded that this severe mental illness and condition has continued to exist "at all times subsequent to his conviction ... and continuing to the present day and indefinitely into the future."

■■■ Because this motion was filed after the conclusion of the trial and post-conviction relief hearing, however, we must deny defendant's request. A party may not supplement the record on appeal with documents never presented to the trial court and to which the opposing party has had no opportunity to respond. This evidence is not properly a part of the record before us and will not be considered because it involves matters not raised or considered at trial, or at the post-conviction relief hearing. *Edwards v. Schoemehl,* 765 S.W.2d 607, 610 (Mo. banc 1989), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3188, 105 L.Ed.2d 697 (1989).

■■■ In addition, evidence of a post-trial competency determination is not applicable here.[1] A psychiatric competency evaluation cannot be ordered after the defendant is sentenced. *State v. McMillin,* 783 S.W.2d

at 90; *Shaw v. State,* 686 S.W.2d 513, 515 (Mo.App.1985). Section 552.020 procedures are "designed to remedy constitutional and statutory violations at trial ... [and] it is the effect of the disease or defect upon defendant's capacity to defend himself that is critical." *Shaw,* 686 S.W.2d at 515. The appropriate time period for determining Tokar's ability to defend himself ended after his sentencing.

Tokar's motion to supplement the record on appeal is denied.

### III. Competence to Stand Trial

#### A.

On direct appeal, Tokar assigns error to the trial court in failing to hold a competency hearing, even though the defense did not request such a hearing at any stage of Tokar's trial or post-conviction relief proceedings. This is a sensitive constitutional issue. While the law is reasonably clear, the application of the law to the facts of any given case often is very difficult.

■■■ Due process requires that a defendant may not be tried unless he is competent to stand trial. *Medina v. California,* 505 U.S. 437, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992); *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 904, 43 L.Ed.2d 103 (1975); *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 838, 15 L.Ed.2d 815 (1966); *see generally* 22A C.J.S. Criminal Law §§ 549–54 and 21 Am.Jur.2d Criminal Law §§ 95–106. The standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960). An appellate court should determine "whether a reasonable judge, in the same situation as the trial court, should have experienced doubt about the accused's competen-

---

1. Dr. Simmons' report, however, may be germane regarding whether Tokar's death sentence should be executed. *§ 552.060; see generally* Roberta M. Harding, *"Endgame": Competency and the Execution of Condemned Inmates—A Proposal to Satisfy the Eighth Amendment's Pro-* *hibition Against the Infliction of Cruel and Unusual Punishment,* 14 St. Louis U.Pub.L.Rev. 105 (1994) (discussing the impact of incompetency on executions of prisoners under the Eighth Amendment).

cy to stand trial." *Branscomb v. Norris,* 47 F.3d 258, 261 (8th Cir.1995), *cert. denied,* —— U.S. ——, 115 S.Ct. 2260, 132 L.Ed.2d 266 (1995). Furthermore, "one cannot fault a trial court judge for failing to determine a question that he/she has no reason to believe is in issue." *Davis v. Alabama,* 545 F.2d 460, 464 (5th Cir.1977), *cert. denied,* 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977).

■ Section 552.020, RSMo 1994, sets out the procedures required to ensure a fair determination of a defendant's mental competence.[2] A judge must order psychiatric or psychological exams when he or she has "reasonable cause to believe that the accused lacks mental fitness to proceed." *§ 552.020.2.* In order to necessitate a *sua sponte* order for a competency hearing, there must be some information, evidence, or observation that triggers the statutory requirement of "reasonable cause".

The United States Supreme Court has addressed this issue in relation to § 552.020 in *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1976). The Court held that the statute was "on its face, constitutionally adequate to protect a defendant's right not to be tried while legally incompetent." 95 S.Ct. at 904. As might be expected the facts in *Drope* were unique.

Drope and two others were charged with the forcible rape of Drope's wife. Prior to trial, Drope filed a motion for a continuance to receive "an examination, evaluation and psychiatric treatment." The motion contained a copy of a report by a Dr. Joseph Shuman concluding that Drope "certainly needs the aid of a psychiatrist" and that he was "a very neurotic individual who is also depressed and perhaps he is depressed for most of the time." The motion was overruled and approximately one month later, Drope's trial began.

On the first day of trial, Drope's wife testified that Drope was sick and needed psychiatric care. She also testified that on the Sunday before trial he "tried to choke me, tried to kill me." Drope did not appear for trial the second day because he shot himself in the abdomen. Denying defense counsel's motion for a mistrial, the court ultimately sentenced Drope to life imprisonment, after a guilty verdict by the jury. At his post-conviction hearing, Drope presented the testimony of two psychiatrists. They indicated that reasonable cause to doubt Drope's competency to understand the proceedings against him existed from his attempted suicide during his trial for the rape of his wife.

The United States Supreme Court reversed the conviction. It stated that, in Drope's case, the "Missouri courts failed to consider and give proper weight to the record evidence." It continued by stating:

> Too little weight was given to the testimony of petitioner's wife that on the Sunday prior to trial he tried to choke her to death. For a man whose fate depended in large measure on the indulgence of his wife, who had hesitated about pressing the prosecution, this hardly could be regarded as rational conduct. [Footnote omitted.] Moreover, in considering the indicia of petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia in applying the objective standard of Mo.Rev.Stat. § 552.020(2). We need not address the Court of Appeals' conclusion that an attempt to commit suicide does not create a reasonable doubt of competence to stand trial as a matter of law. As was true of the psychiatric evaluation, petitioner's attempt to commit suicide "did not stand alone." *Moore v. United States,* 464 F.2d

**2.** The statute provides in pertinent part:
1. No person who as a result of mental disease or defect lacks capacity to assist in his own defense shall be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures.
2. Whenever any judge has reasonable cause to believe that the accused lacks mental fitness to proceed, he shall, upon his own motion or upon motion filed by the state or by or on behalf of the accused, by order of record, appoint one or more private psychiatrists or psychologists ... to examine the accused....

\* \* \* \* \* \*

8. If the court determines that the accused lacks mental fitness to proceed, the criminal proceedings shall be suspended and the court shall commit him to the director of the department of mental health.

663, 666 (9th Cir.1972). We conclude that when considered together with the information available prior to trial and the testimony of petitioner's wife at trial, the information concerning petitioner's suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question.

*Drope*, 95 S.Ct. at 907–08. In short, *Drope* demands a careful analysis of the facts of record before and during trial to determine whether medical evidence, other testimony, or the defendant's behavior and demeanor at trial raised reasonable cause for the trial court to order a psychiatric examination.

█ We have performed such an analysis here and cannot find that the trial court erred. First, there was no motion made by Tokar's counsel requesting a hearing pursuant to § 552.020. Although the statute and Tokar's condition were certainly discussed at the March 1, 1993 pretrial hearing, it was clear that Tokar's counsel sought extra time for another examination by a privately retained psychologist or psychiatrist. Also, Tokar's counsel did not present any facts of actual problems regarding Tokar's competency or cooperation. True, Mr. Gralike, one of Tokar's attorneys, informed the court that "there is a belief by Dr. Cowan that there is some psychological disorder with Mr. Tokar", that Mr. Tokar should "go under psychiatric consultation", and that "we have reason to believe that perhaps his apparent irrational behavior could be attributed to the HIV virus". However, at no point was evidence presented of an actual "mental disease or defect" which would result in Tokar lacking the "capacity to assist in his own defense".[3] Instead, the defense position was most concisely stated as follows:

> Included in our request here today would be for the court to grant us time to have a complete medical diagnosis and physical performed on Mr. Tokar to determine the extent that the HIV virus has impaired his ability either to reason appropriately or to assist his counsel.

Although Tokar's request for a continuance was initially denied, it was subsequently granted. At no time thereafter was the issue of Tokar's competence to stand trial presented to the trial court by Tokar's counsel.

In *Drope*, it was recognized that "judges must depend to some extent on counsel to bring the issues into focus". 95 S.Ct. at 906. Here, there is more than trial counsel not raising the issue. There was affirmative evidence that Tokar was actually competent to stand trial. The trial court had every reason to believe that Tokar's attorneys were fully investigating the competency issue. Tokar's attorneys had obtained two previous examinations and had been granted the continuance they had requested. They had sufficient time to develop the issue by any further examinations that might have been necessary. The attorneys did not present further evidence on Tokar's competence, and, therefore, it was reasonable for the trial court to conclude that the issue was not worthy, in fact, of being brought again to the court's attention. *See United States ex rel. Rivers v. Franzen*, 692 F.2d 491, 499 (7th Cir.1982) (assuming that attorneys on either side would have raised the issue if any doubt surfaced as to the defendant's competence). The failure of defendant or his counsel to raise the competency issue is persuasive evidence that there was no "bona fide doubt" as to defendant's competency during trial. *Id.* at 500.

Second, the evidence presented during trial was inconsistent with any possibility that Tokar was incompetent to stand trial. Dr. Daniel testified at length about his conclusions regarding Tokar's mental state. Dr. Daniel based his opinions on a number of interviews taking approximately seven hours and fifteen minutes (all of which occurred within three months before trial), an interview with Tokar's mother, a review of various records, and a review of a battery of psychological tests given to Tokar by Dr. James Goldman in Kansas City. Dr. Daniel found Tokar to be of average range of intelligence,

---

**3.** During the hearing, Tokar's counsel referred to an affidavit supplied to the court and stated that he could "get an affidavit from Dr. Cowan stating that these are the reasons that he believes psychiatric consultation is necessary." We are unable to find either affidavit in the record on appeal.

of average vocabulary, of average reasoning ability, of well-preserved memory, oriented as to time and place, oriented as to who Dr. Daniel was and why Tokar was being interviewed by him, without evidence of any cognitive disturbance, without evidence of hallucinations, without evidence of perceptual problems, with well-preserved insight and judgment, and able to distinguish right from wrong and to conform his conduct to what the law requires.

Dr. Daniel testified that Tokar was HIV positive, that he had "an underlying paranoid personality disorder and under the influence of alcohol, he could become full-blown paranoid." However, Dr. Daniel gave no indication whatsoever that Tokar lacked the mental capacity to assist in his own defense as a result of mental disease or defect. In fact, this evidence appears to have been introduced to assure the jury that if Tokar was given a life sentence and was kept in a penitentiary, where alcohol was not available to him, he would not be a threat or a danger.

Finally, Tokar gave no indication at trial by his behavior that anything was abnormal. There is no indication in the record of any bizarre behavior on his part. On the two occasions he gave testimony, Tokar's answers were clear and logical. In both instances he stated that he wanted to follow the advice of his attorneys and not testify. Additionally, Tokar filed a *pro se* motion to vacate his conviction pursuant to Rule 29.15. That motion demonstrated adequate competence to appreciate the proceedings against him.

The point is denied.

### B.

Tokar also attempts to rely upon *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), to argue that he was entitled to an *ex parte* hearing on the issue of competency. Tokar's argument fails in both law and fact.

*Ake* dealt with a defendant whose behavior at arraignment "was so bizarre as to prompt the trial judge, *sua sponte*, to have him examined for competency." 105 S.Ct. at 1098. After an initial determination that Ake was not competent to stand trial, he was heavily medicated and declared competent to proceed by a court-appointed psychiatrist. Ake's counsel, however, was denied a court-appointed expert to assist Ake in an insanity defense to the crime itself. The Supreme Court held that this was a denial of due process and noted that "when the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense, the need for the assistance of a psychiatrist is readily apparent." *Id.* at 1096.

The state argues that this sentence in *Ake* is limited solely to insanity defense situations and does not apply here in a competency situation. This may be so, but even if this holding applies to competency issues as well, it would not apply in this case. *Ake* dealt with an attempt by counsel to have a psychiatrist appointed by the court and the dilemma of establishing cause for such an appointment without having to reveal defense strategy. In this case Tokar's counsel did not seek court-appointment of a psychiatrist. They merely requested a continuance. This is a matter as to which the state had a right to be heard. Likewise, should Tokar's counsel have decided to actually contest Tokar's competency for trial, § 552.020.7 would allow the state to "summon and to cross-examine" any psychiatrist presenting evidence on Tokar's behalf. *State v. Wise*, 879 S.W.2d 494, 508 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995).

*Ake* sought to provide an indigent criminal defendant the resources to defend himself, without the need to reveal his defense strategy to the state. However, *Ake* did not create a shield behind which the defense could obtain *ex parte* rulings on the merits of the case or on contested issues. Further, Tokar has shown no prejudice in fact by the court's failure to hold any portion of the March 1, 1993 hearing *ex parte*. The continuance sought was ultimately granted. Tokar's counsel has failed to point to any information disclosed at that hearing that resulted in prejudice to Tokar.

The point is denied.

## IV. Claims of Ineffective Assistance of Counsel

### A. Failure to Develop Penalty Phase Mitigation

Tokar claims that his trial attorneys were ineffective for failing to provide an adequate and consistent mitigation case during the penalty phase. Under *Strickland*, Tokar has failed to present any evidence that proves his trial attorneys were deficient in this regard. During mitigation, the defense called Tokar's mother, his aunt, and one of his first cousins to explain how Tokar began drinking alcohol in his early teen years and that Tokar acted very different and paranoid after he had been drinking. Then the defense called a clinical toxicologist to explain the effects of drinking alcohol on persons generally. Finally, the defense called Dr. Daniel, who discussed Tokar's HIV-positive status, his parents' divorce, his father's alcoholism, sexual abuse inflicted upon Tokar as a child, "multiple trauma in his life", Tokar's "elevated paranoia scale", and the influence of alcohol in causing him to become "full-blown paranoid."

Tokar relies primarily upon Dr. Smith, a clinical psychologist, whose deposition was presented at the post-conviction relief hearing. Dr. Smith said that he "felt strongly that the defense counsel had failed to adequately utilize their experts in providing information regarding Mr. Tokar's background." He continued: "There were a number of things in Mr. Tokar's documents that were not adequately expanded upon during trial that I feel would be important in consideration of the penalty phase."

There is a presumption that counsel's alleged omissions were sound trial strategy. *Sidebottom v. State*, 781 S.W.2d 791, 795 (Mo. banc 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). Tokar has not overcome this presumption. During the penalty phase, the defense focused primarily on the theory that, without alcohol, Tokar was not aggressive or dangerous. If the jury believed this argument, they could have sentenced Tokar to life in prison, where he would not have access to alcohol and would be docile. It cannot be said that this was an illogical or inappropriate strategy choice on the part of Tokar's counsel.

Although Dr. Smith insisted that it would have been better, in his opinion, to focus on Tokar's family background, his opinion is not persuasive in two respects. First, Smith is not a lawyer, nor does he possess sufficient experience in death penalty litigation to be competent to express opinion evidence on such strategic choices. In fact, certain portions of his testimony reveal his lack of understanding of practical strategic considerations. The following exchange took place when Dr. Smith was cross-examined about his "opinion" that trial counsel should have emphasized the effect upon Tokar of his father's death:

Q. [State's attorney]: I think you indicated that you felt that the witnesses at Mr. Tokar's actual trial should have emphasized the fact that Jeffrey was—and again I think I'm quoting you—crushed when his father died; is that correct?

A. [Dr. Smith]: I felt that the defense counsel should have asked more about the impact of various life events upon Jeffrey's development.

Q.: And among those I think was the fact that Jeffrey's father's death, his natural father's death, had an impact on Jeffrey's development?

A. Yes.

Q. And I think you even testified on direct examination that you thought that that was one of those significant events in Jeffrey's life and that some changes were noted in his behavior after his father died?

A. Yes.

Q. And the point I'm leading to is at the trial Mr. Tokar was accused of killing a father in front of his two young children. Do you understand that?

A. Yes.

Q. And do you see the irony in asking the jury to have some sympathy for Mr. Tokar because he lost his father when Mr. Tokar is standing accused of killing a father in front of two young children?

A. No.

Second, even if Dr. Smith was competent to express an opinion in this regard, he did not.

The opinions he expressed constitute little more than second guessing, which is insufficient to meet the *Strickland* requirements. The trial court's determination on this issue was not clearly erroneous.

The point is denied.

### B. Failure Regarding Competency and Insanity Defense Issues

During oral argument, Tokar argued that his trial attorneys were deficient in their performance by not requesting a competency hearing pursuant to § 552.020. There were also references to the fact that an insanity defense was not pursued. However, neither of these arguments were adequately raised in Tokar's *pro se* post-conviction relief motion, the amended post-conviction relief motion, or the points relied on in Tokar's appellate brief filed with this Court. *Rule 29.15(d); State v. Twenter,* 818 S.W.2d 628, 641 (Mo. banc 1991). Further, the record below establishes no just cause for us to consider the merits of these claims *ex gratia.* These arguments are waived.

### C. Arrest Without Probable Cause

Tokar contends that he received ineffective assistance of counsel because there was no objection made to his arrest, which he alleges was without probable cause. This claim fails on its merits.

Probable cause to arrest exists when the arresting officer's knowledge of the particular facts and circumstances is sufficient to warrant a prudent person's belief that a suspect has committed an offense. *State v. Heitman,* 589 S.W.2d 249, 253 (Mo. banc 1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2164, 64 L.Ed.2d 795 (1980). Witnesses identified a yellow station wagon as the vehicle in which the murderer of Johnny Douglass used to go to and from the victim's home. They also claimed the suspect was with a white female. The sheriff's office knew Tokar had been stuck in a ditch with a white female in a yellow station wagon near Centralia only days before the murder. Douglass was killed in the course of a burglary and Tokar had prior arrests for burglary and assault. Additional information existed that Tokar preferred to burglarize earth con-

tact homes and to pack items into pillowcases. Both of these factors were also present in the Douglass home burglary. All of these circumstances demonstrate there was probable cause to arrest Tokar. Because there was probable cause to arrest Tokar, there is no ineffective assistance of counsel for not objecting to the arrest warrant. The trial court's determination on this issue was not clearly erroneous.

The point is denied.

### D. Suppression of Identification Evidence

Tokar claims that his trial counsel was constitutionally ineffective for not filing a motion to suppress the identification evidence against him. The crux of Tokar's complaint centers on the testimony of Jarad Douglass and his identification of Tokar in a pretrial lineup and during trial. Tokar argues that the lineup was unduly suggestive and, therefore, his in-trial identification was also unreliable.

A review of the exhibits in the record demonstrates that the lineup was not unduly suggestive. All of the individuals in the lineup were white males, who appeared approximately the same height, who wore the same jail uniform, and who all had mustaches. Jarad picked Tokar out of the lineup prior to and during the trial. Linda Benoit, the Douglass' neighbor, also picked Tokar from the same lineup. John Romine, a driver who had noticed Tokar and Stickley in their car, chose Tokar from a completely different lineup, which is not contested by Tokar on appeal. Considering the "totality of the circumstances", these identifications have sufficient indicia of reliability. *State v. Hornbuckle,* 769 S.W.2d 89, 93 (Mo. banc 1989). The trial court's determination on this issue is not clearly erroneous.

This point is denied.

### E. Prosecutor's Statements During Arguments

Tokar complains next of twenty-one different statements made by the prosecutor, without defense objection, during the opening and closings. He alleges that they

caused his death sentence to be unconstitutionally based on caprice and emotion. *See Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977). Only three of the statements were presented to the motion court for post-conviction relief. All three of the statements were made in closing argument during the penalty phase. Complaints concerning the other eighteen statements are waived. *Rule 29.15(d); State v. Twenter,* 818 S.W.2d 628, 641 (Mo. banc 1991).

Trial counsel did not object to these statements at issue. Tokar does not argue that any of these statements amounted to plain error. Therefore, Tokar is left to argue ineffective assistance of counsel. At Tokar's hearing for post-conviction relief no evidence was presented regarding these claims. The motion court ruled that the failure to object did not constitute ineffective assistance of counsel.

### 1.

■ The first statement in issue is the prosecutor's reference that the jurors might pray that their children will not have to experience what the Douglass children went through with the murder of their father. Tokar correctly argues that the statement improperly personalizes the argument and is error. *State v. Raspberry,* 452 S.W.2d 169, 172 (Mo. banc 1970).

■ However, this alone does not justify reversal. Under *Strickland,* Tokar must still prove that trial counsel's failure to object did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that he was prejudiced. Tokar does not meet either of these standards. Tokar introduced no evidence regarding trial counsel's failure to object to this argument, despite questioning them regarding other issues at the post-conviction relief hearing.

In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes. It is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good. Without further evidence on this issue, Tokar has not overcome the presumption that the failure to object was a strategic choice by competent counsel.

In addition, Tokar has not established that prejudice resulted to the extent that there exists a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. In *Newlon v. Armontrout,* 885 F.2d 1328, 1337 n. 10 (8th Cir.1989), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990), the Eighth Circuit adopted the following factors to address in ascertaining whether error results in prejudice during a penalty phase closing argument: 1) measure what type of prejudice arose from the prosecutor's argument; 2) examine what the defense counsel did in his argument to minimize the prejudice; 3) review the jury instructions to see if the jury was properly instructed in the case; and 4) consider all of the aggravating and mitigating information to determine whether there is a reasonable probability that the outcome of the sentencing phase would have been different.

While the argument made by the prosecutor was improper, it was an isolated reference and the only improper argument that Tokar has established on appeal. *See Blair v. Armontrout,* 916 F.2d 1310, 1325 (8th Cir. 1990), *cert. denied,* 502 U.S. 825, 112 S.Ct. 89, 116 L.Ed.2d 62 (1991) (explaining that a single improper argument may not be sufficiently prejudicial to fatally infect the sentencing proceedings). The jury was properly instructed at the close of the penalty phase. The level of aggravating circumstances in this case overcomes any reasonable probability that the outcome of the sentencing phase would have been any different in the absence of this remark by the prosecutor when considered in the context of the trial as a whole.

### 2.

■ Tokar also challenges the prosecutor's argument that: "We, of course, sincerely believe that the death penalty is warranted in this case and, of course, we believed that from the start. And we ask in this case that if you find the aggravating circumstances that you find both.... You ought to say in your verdict, in my opinion,

in our opinion, based on the evidence, that this was outrageously wanton, vile and inhuman." Tokar complains that this second statement impermissibly contains the prosecutor's personal opinion, with words such as "we" and "I". However, when such opinion is based on evidence, a prosecuting attorney's opinion of the accused's guilt is permissible. *State v. Moore*, 428 S.W.2d 563, 565 (Mo.1968); *State v. Paglino*, 319 S.W.2d 613, 625 (Mo.1958). Moreover, each of these statements merely reflected the obvious. One could not reasonably expect a prosecutor to present a case that he or she did not believe. Failure to object to this statement does not amount to ineffective assistance of counsel.

#### 3.

■ The third statement at issue is the prosecutor's argument that: "There has been absolutely no remorse exhibited. The only regret this defendant has shown through this evidence is his regret that those young kids didn't meet the same fate as their father ..." Tokar claims that reference was improper. However, during the punishment phase, a prosecutor may comment on the lack of evidence of remorse of the defendant to show the *nature of his character. State v. Six*, 805 S.W.2d 159, 166 (Mo. banc 1991), *cert. denied*, 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Moreover, the statement refers to evidence in the record. Stickley testified that Tokar had, in fact, stated he wished he would have "killed the kids so no one could testify and say that we were there." A prosecutor can always argue reasonable inferences from the evidence. *State v. Shurn*, 866 S.W.2d at 460. Failing to object to this statement does not amount to ineffective assistance of counsel.

#### 4.

Moreover, the alleged mistakes in this case do not equate to the "egregious errors, each compounding the other" that we found in *State v. Storey*, 901 S.W.2d 886, 902 (Mo. banc 1995). In that case, we reversed the defendant's sentence of death and remanded the cause for a new sentencing proceeding because defense counsel was ineffective in

failing to object to the prosecutor's repeated argument of facts outside the record, personalization of the argument, and misstatement of the law. *Storey*, 901 S.W.2d at 902–03. The statements argued here simply do not compare. Tokar has not established that his attorneys failed to exercise customary skill and diligence in failing to object to these statements, nor has he shown that he suffered any prejudice therefrom. The trial court's determination on these issues is not clearly erroneous.

These points are denied.

### V. Statements During Juror Voir Dire

■ Tokar assigns error to an analogy offered by the prosecutor during voir dire questioning of the first of two venire panels. The prosecutor described a hallway having "three doors", through which the jurors had to proceed during Tokar's guilt and penalty phases. The first door represented the State's burden of proof regarding the defendant's guilt. The second door represented the State's burden of proof regarding the existence of at least one aggravating circumstance that warrants the death penalty. If the State met its burden of proof at the first two doors, the third and final door would have represented a decision on a sentence of death.

■ Tokar argues that the prosecutor's description of the jurors' duties does not sufficiently include mitigating circumstances and the weighing of those against aggravating circumstances. Tokar alleges both ineffective assistance of counsel for not objecting during the voir dire and plain error. Appellant waived the ineffective assistance claim when not raised in his *pro se* 29.15 motion or post-conviction counsel's amended 29.15 motion. *Rule 29.15(d); State v. Twenter*, 818 S.W.2d 628, 641 (Mo. banc 1991).

■ The "plain error" rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review. *State v. Ervin*, 835 S.W.2d 905, 920 (Mo. banc 1992), *cert. denied*, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Appellant must make a demonstration that mani-

fest injustice or a miscarriage of justice will occur if the error is not corrected. *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993). The burden is on the defendant to prove the decisive significance of improper argument before a conviction will be reversed. *Id.*

In this case, both the prosecutor and defense counsel explained that mitigating and aggravating circumstances would be involved in the sentencing decision. Considering the analogy with the closing arguments as a whole, there was no plain error in explaining the jurors' decision-making process in this way. *See §§ 565.030 and 565.032.*

The point is denied.

### VI. Error in Allowing Reference to Defendant's AIDS

Tokar next claims that the trial court erred by admitting evidence that he had AIDS during the penalty phase. A felon who had served time in the cell adjacent to Tokar's cell testified, over a defense objection, that Tokar told him that he had AIDS and "had nothing to lose" by committing additional crimes. Tokar claims that having the disease is regarded as disgraceful and that the word "AIDS" inspires "greater loathing than murder does." Tokar further contends that admitting evidence of his AIDS diagnosis was irrelevant, prejudicial, and a violation of his Eighth Amendment rights because it allowed the jurors to use unconstitutional factors in determining his sentence. *See State v. Taylor*, 473 S.W.2d 385 (Mo.1971) (where this Court reversed a criminal conviction because the trial court admitted evidence that defendant was a pimp); *State v. Baber*, 297 S.W.2d 439 (Mo.1956) (where this Court reversed a criminal conviction after the trial court allowed evidence that defendant was an adulterer).

 Trial courts retain broad discretion over issues of relevancy and admissibility of evidence, and those decisions will not be interfered with unless there is a clear showing of abuse of discretion. *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992). Evidence will be relevant as long as it "logically tends to prove or disprove a fact in issue." *State v. Hill*, 817 S.W.2d 584, 587 (Mo.App.E.D.1991).

During the penalty phase, defense counsel argued that when Tokar was not under the influence of alcohol, he could appreciate and conform to rules and behave nonaggressively. Defense counsel wanted the jury to believe that Tokar was "emotionally disturbed" and failed to "appreciate the criminality of his conduct" only when under the influence of alcohol. Therefore, according to defense counsel, a sentence of life imprisonment without parole would be sufficient punishment in Tokar's case.

 The prosecutor did not present this testimony from Tokar's prison-mate to disparage Tokar's character. Instead, this evidence was relevant in the penalty phase to rebut the defense's plea that alcohol was the main catalyst in Tokar's crimes. A defendant's character is always relevant in the sentencing context. *State v. Six*, 805 S.W.2d at 166. The fact that Tokar said he had nothing to lose because he had the AIDS virus demonstrates his lack of good character and that alcohol was not the only cause of Tokar's crimes. Presumably Tokar was not under the influence of alcohol when making this statement in prison. The statement demonstrates Tokar's lack of respect for the justice system and his victims, and the words reveal a purposeful intent to commit future crimes. The mere fact that the prison-mate's testimony included information of Tokar's infliction with the AIDS virus did not render the testimony excessively prejudicial. The trial court did not err.

The point is denied.

### VII. Objections to Instructions

Tokar raises three points of error regarding submission of approved MAI–CR instructions to the jury.

#### A.

First, Tokar alleges trial court error in submitting MAI–CR 3d 313.42B over a defense objection. This instruction allows the jury to decide, while considering the aggravating circumstances it has found in MAI–CR 3d 313.40, whether the death penalty is

warranted. Tokar claims the instruction does not allow for the proper weighing of the mitigating circumstances with the aggravating circumstances, as required by § 565.030.4(3), the Eighth Amendment to the United States Constitution, and § 21 of the Missouri Bill of Rights. *See Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

Basically, Tokar takes issue with the order in which the instructions were given because the jurors were forced to find aggravating circumstances before they were asked to consider the mitigating circumstances. Tokar states that MAI–CR 3d 313.42B (decision whether death penalty is warranted) should not be given to the jury before 313.44B (consideration of mitigating circumstances) and 313.46B (final decision on punishment) are given.

■ Jurors do not need to consider mitigating circumstances until they find an aggravating circumstance that sufficiently warrants imposition of the death penalty. Instruction 313.42B does not ask the jury to impose the death penalty, but rather it specifically directs the jury "to decide whether the aggravating circumstances are sufficient to *warrant* [4] the imposition of death as punishment." (emphasis added). This instruction actually erects a barrier, in favor of the defendant, which must be surpassed before the jury can even begin to consider whether it should impose the death penalty under the specific facts of the defendant's case they are deciding. The succeeding two instructions make absolutely clear that: 1) the jury can decide the mitigating circumstances outweigh aggravating circumstances (313.44B); and 2) the jury never has to decide to impose the death penalty, even if they find the mitigating circumstances do not outweigh the aggravating circumstances (313.46B).

The question whether mitigating circumstances exist does not logically present itself until the jury first finds the existence of at least one aggravating circumstance sufficient to warrant the death penalty. *See*

§ 565.030.4; *State v. Shaw,* 636 S.W.2d 667, 675 (Mo. banc 1982), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982) (explaining that a jury finding of one or more statutory aggravating circumstances is the threshold requirement that must be met before the jury can decide to recommend the death sentence). The trial court did not err.

The point is denied.

### B.

■ Second, Tokar claims the trial court erred by submitting MAI–CR 3d 313.44B over a defense objection because it does not provide for a full consideration of all mitigating circumstances. Tokar alleges that the trial court erred when it did not submit his proffered alternative instruction, which specifically listed nonstatutory mitigating circumstances. Tokar further argues the instruction tells the jurors that they "may also consider" any nonstatutory circumstances, but it does not allow the defendant to present a list of such circumstances while the prosecution gets to present a list of nonstatutory *aggravating* circumstances. Tokar contends that this is a violation of his Eighth and Fourteenth Amendment rights under the Constitution of the United States, and §§ 2, 10, and 21 of the Missouri Bill of Rights.

There is no merit to either of these arguments. The approved instruction adequately covers the jury's consideration of mitigating circumstances, and we have repeatedly held that there is no requirement that the jury be given a non-MAI list of nonstatutory mitigating circumstances. *See, e.g., State v. Wise,* 879 S.W.2d 494, 518 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *State v. Mease,* 842 S.W.2d 98, 113 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

Furthermore, this Court has stated that "may consider" language does not preclude the necessary consideration of mitigation evidence by the jury. Instead, it gives the jury discretion in weighing mitigating evidence.

---

4. The verb "to warrant" is defined as "to serve as or give sufficient ground or reason for; to require or permit as a consequence; to justify." *Webster's Third New International Dictionary* 2578 (1981).

*State v. Debler*, 856 S.W.2d 641, 655 (Mo. banc 1993). This instruction complies with the constitutional requirements for the submission of mitigating circumstances in death penalty cases. *Id.* The trial court did not err.

The point is denied.

### C.

Finally, Tokar complains that the trial court erred by submitting, over a defense objection, MAI–CR 3d 313.40, which instructed:

> In determining the punishment to be assessed against defendant for the murder of John P. Douglass, you must first unanimously determine whether one or more of the following aggravating circumstances exist:
>
> 1. Whether the murder of John P. Douglass involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find that the defendant killed John P. Douglass after he was bound or otherwise rendered helpless by defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life.
>
> 2. Whether the murder of John P. Douglass was committed while the defendant was engaged in the perpetration of burglary. A person commits the crime of burglary when he knowingly enters unlawfully in a building or inhabitable structure for the purpose of committing stealing.
>
> You are further instructed that the burden rests upon the State to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

The instruction is patterned after the statutory aggravating circumstances provided by § 565.032.2(7) and (11).

Tokar argues the language in the first statutory aggravating circumstance instruction is unconstitutionally vague, inflammatory, and "provides a basis for verdicts rooted in raw emotion." In this case, the jury was specifically provided guidance on when they could find this aggravating circumstance. This Court has previously held that such language and limiting instruction provides sufficient guidance to the sentencing jurors and that the instruction is not unconstitutionally vague. *State v. Mease*, 842 S.W.2d 98, 113 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *Sidebottom v. State*, 781 S.W.2d 791, 799 (Mo. banc 1989), *cert. denied*, 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990).

Moreover, the jury also found the second statutory aggravating circumstance, that the murder was committed while defendant was engaged in the perpetration of a burglary, under § 565.032.2(11). In the instruction, the jury was sufficiently apprised of what constitutes "burglary". The evidence fully supports a determination that the murder was committed while Tokar was burglarizing the Douglass residence. The second aggravating circumstance found by the jury is valid, and Tokar has not argued otherwise on appeal.

 Therefore, even if the first aggravating circumstances was invalid, the failure of one circumstance does not taint the proceedings so as to invalidate the other aggravating circumstance found and the sentence of death imposed. *Sidebottom*, 781 S.W.2d at 799. A death sentence will be affirmed if even one valid statutory aggravating circumstance is found. *State v. Sloan*, 756 S.W.2d 503, 509 (Mo. banc 1988), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1174, 103 L.Ed.2d 236 (1989). The trial court did not err.

The point is denied.

### VIII. Death Sentence Proportionality Review

 This Court is required to review, pursuant to Section 565.035.3, RSMo 1994, the sentence of death imposed in this case. We find no evidence that the sentence was imposed "under the influence of passion, prejudice, or any other arbitrary factor," *§ 565.035.3(1)*, and we find that the evidence supports the jury's finding of the two statuto-

ry aggravating circumstances under Section 565.032.2(7) and (11). *§ 565.035.3(2).* We further find that the sentence of death is not "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence, and the defendant." *§ 565.035.3(3).*

Only when "the case, taken as a whole, is plainly lacking circumstances consistent with those in similar cases in which the death penalty has been imposed," will resentencing be ordered. *State v. Ramsey,* 864 S.W.2d 320, 328 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Our proportionality review serves the purpose of assuring that a death sentence is not a "freakish or wanton" punishment under the facts of the case. *Id.*

The facts of this case demonstrate that at least one, if not both, of Johnny Douglass' children witnessed his murder. The murder was also committed during the burglary of the victim's home. The forensic evidence shows that the first gunshot rendered Johnny Douglass helpless, and the second shot killed him. There was also testimony that Johnny Douglass was shot while in a kneeling or crouched position in the garage.

These facts are consistent with death sentences affirmed in cases when victims were murdered during the course of a robbery. *Ramsey,* 864 S.W.2d at 327; *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Pollard,* 735 S.W.2d 345 (Mo. banc 1987), *cert. denied,* 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 682 (1988); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985), *cert. denied,* 476 U.S. 1109, 106 S.Ct. 1959, 90 L.Ed.2d 367 (1986). The death penalty has also been imposed where the victim was killed to eliminate a witness and to avoid arrest. *State v. Six,* 805 S.W.2d 159, 169 (Mo. banc 1991), *cert. denied,* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991); *State v. Grubbs,* 724 S.W.2d 494, 501 (Mo. banc 1987), *cert. denied,* 482 U.S. 931, 107 S.Ct. 3220, 96 L.Ed.2d 707 (1987).

## IX.

The judgment of conviction, sentence of death, and denial of post-conviction relief are affirmed.

HOLSTEIN, C.J., BENTON, LIMBAUGH, ROBERTSON, and COVINGTON, JJ., and O'SHEA, Senior Judge, concur.

WHITE, J., not sitting.