STATE of Missouri, Respondent,

v.

Sheena Renea EASTBURN, Appellant.

Sheena EASTBURN, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 20604, 21163.

Missouri Court of Appeals,
Southern District,
Division Two.

July 16, 1997.

Motion for Rehearing and Transfer to
Supreme Court Denied Aug. 6, 1997.

Application to Transfer Denied
Sept. 30, 1997.

Rebecca L. Kurz, Asst. Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jill C. LaHue, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found Appellant, Sheena Renea Eastburn, guilty of murder in the first degree, § 565.020, RSMo Cum.Supp.1992, and assessed punishment at imprisonment for life without eligibility for probation or parole. The trial court entered judgment per the verdict. Appellant brings appeal 20604 from that judgment.

While that appeal was pending, Appellant filed a motion to vacate the judgment and sentence per Rule 29.15.[1] The motion court denied relief after an evidentiary hearing. Appellant brings appeal 21163 from that order.

We consolidated the appeals, Rule 29.15(*l*), but address them separately in this opinion.

### Appeal 20604

Appellant's brief presents three points relied on, two of which—the first and third—pertain to this appeal.

The first point avers the trial court erred in failing, *sua sponte,* to "remove for cause" two members of the venire. The third point maintains the trial court erred in overruling Appellant's hearsay objections to testimony of three State's witnesses.

The victim was Tim Eastburn. He married Appellant November 15, 1990. The marriage was dissolved September 17, 1992. The murder occurred two months later, on November 19, 1992.

Appellant was represented at trial by a public defender and an assistant public defender. For convenience, we henceforth refer to them as "Defender" and "Assistant Defender," respectively.

Appellant's first claim of error arises from voir dire. Assistant Defender conducted voir dire for Appellant. One of his statements to the venire was:

"Sheena Eastburn is presumed innocent unless and until you all believe that she's

been proven guilty beyond a reasonable doubt. She doesn't have to take the stand, she doesn't have to testify. In fact, she doesn't have to put on any evidence at all, and I as her attorney or [Defender] as her attorney, we don't have to put on any evidence.

Is there anybody who believes that we should put on some evidence?"

Several members of the venire responded. Among them were Scott Woodworth and Alta Royal. The transcript shows:

"Venireman Woodworth: I do.

[Assistant Defender]: ... you're ... Mr. Woodworth?

Venireman Woodworth: Yeah.

[Assistant Defender]: What do you believe, sir?

Venireman Woodworth: Believe it should be some explained.

. . . .

[Assistant Defender]: ... Mr. Woodworth, are you expecting the defense to prove their [sic] innocence? Are you expecting us to prove Sheena Eastburn's innocence?

Venireman Woodworth: Yeah.

[Assistant Defender]: Okay. Anyone else agree with Mr. Woodworth?

. . . .

[Assistant Defender]: ... Ms. Royal, you're shaking your head?

Venireman Royal: Yeah, I agree.

[Assistant Defender]: You expect us to prove that she's innocent?

Venireman Royal: Yeah."

At the conclusion of voir dire, Assistant Defender challenged numerous members of the venire for cause[2]; however, Assistant Defender lodged no challenge for cause against either Woodworth or Royal. Appellant thereafter used her peremptory challenges (§ 494.480.2(2), RSMo 1994) against members of the venire other than Wood-

---

1. Rule references are to Missouri Rules of Criminal Procedure (1995). That is because Appellant was sentenced August 22, 1995, and filed her motion for post-conviction relief November 27, 1995. The current (1997) version of Rule 29.15(m) provides that in such circumstances, post-conviction relief is governed by the version

of Rule 29.15 in effect when the motion for post-conviction relief was filed or December 31, 1995, whichever is earlier.

2. The trial court granted some challenges and denied others.

worth and Royal. Consequently, Woodworth and Royal served on the jury.[3]

The only complaint in Appellant's motion for new trial regarding Woodworth was:

"The Court erred ... when it allowed venire person ... Woodworth to be seated on the jury after he stated that he believed defendant should testify to prove her innocence. As defendant was required to use the majority of her peremptory challenges on [other] venire persons who should have been struck for cause ... defendant was unable to exclude venire person ... Woodworth[.]"

The only complaint in Appellant's motion for new trial regarding Royal was identical to the complaint regarding Woodworth.

Appellant's first point relied on reads:

"The trial court plainly erred in failing to sua sponte remove for cause venirepersons ... Woodworth, and ... Royal, because Appellant was denied a jury of twelve unbiased and qualified jurors, in violation of her rights to due process of law and to a fair trial ... in that Woodworth and Royal said they expected the defense to prove Appellant's innocence, even though they were told that they were required by law to presume Appellant innocent, and that the State had the burden of proving her guilty beyond a reasonable doubt."

There is a subtle difference between the complaint about Woodworth and Royal in Appellant's motion for new trial and the complaint about them in Appellant's first point on appeal.

The complaint in the motion for new trial was that Woodworth and Royal stated they believed Appellant *should testify* to prove her innocence. The complaint in the first point on appeal is that Woodworth and Royal said they *expected the defense to prove Appellant's innocence.*

As set forth *infra* in our account of the evidence, Appellant testified at trial regarding her role in the events preceding the

murder and her actions and intent at the scene of the murder during its occurrence. In that respect, the instant case is like *State v. Hadley,* 815 S.W.2d 422 (Mo. banc 1991).

In *Hadley,* the members of the venire were asked if any of them believed the accused had to prove his innocence. *Id.* at 423. One venire member replied, "Well, I feel that if he doesn't take the stand that I wouldn't be able to judge it impartially." *Id.* On appeal, the accused maintained the trial court committed plain error by failing to exclude the venire member *sua sponte. Id.* The Supreme Court held:

"Any potential miscarriage of justice in having [the venire member] on the jury was entirely dependent upon defendant failing to testify. From the outset, it was apparent defendant would testify. His was the only testimony supporting the claim of self defense. When defendant took the stand, the possibility of prejudice disclosed by [the venire member's] voir dire examination evaporated. In any event, a trial court is under no duty to strike a juror on its own motion, even though the juror states on voir dire that if the defendant fails to testify the juror would be more likely to convict."

*Id.* at 424[2].

It is clear from *Hadley* that we cannot convict the trial court of reversible error in failing to remove Woodworth and Royal from the venire *sua sponte* merely because they stated they believed Appellant *should testify* (the complaint in Appellant's motion for new trial). Perhaps aware of this, Appellant claims on appeal that the trial court should have removed Woodworth and Royal from the venire *sua sponte* because they said they *expected the defense to prove Appellant's innocence.*

Appellant concedes her claim on appeal is not preserved for review in that neither of her lawyers challenged Woodworth or Royal for cause at trial. Appellant asks for plain error review per Rule 30.20.

---

**3.** The jury list is not in the record on appeal. However, the verdict was signed by Royal as "Foreperson," and at the evidentiary hearing in the motion court (discussed *infra* ), Assistant Defender testified that Woodworth and Royal served on the jury. The State does not argue otherwise.

■ To prevail under plain error review, an accused must demonstrate that manifest injustice or a miscarriage of justice resulted from the alleged error. *State v. Nunley*, 923 S.W.2d 911, 920[15] (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 772, 136 L.Ed.2d 717 (1997). We find no basis for plain error relief here.

■ First, Missouri courts have steadfastly held a trial court is under no duty to remove any venire member *sua sponte. State v. Overby*, 432 S.W.2d 277, 279[8] (Mo. 1968); *State v. Johnson*, 637 S.W.2d 290, 291[4] (Mo.App. S.D.1982); *State v. Dodson*, 595 S.W.2d 59, 60[3] (Mo.App. E.D.1980); *State v. Lane*, 551 S.W.2d 900, 907[18] (Mo. App.1977); *State v. Gamache*, 519 S.W.2d 34, 41[16] (Mo.App.1975).

Second, Appellant cites no case where an appellate court, on plain error review, convicted a trial court of reversible error in failing, *sua sponte,* to remove a member of the venire. We suspect the absence of such a case stems from the policy articulated in *State v. Sumowski*, 794 S.W.2d 643, 647 (Mo. banc 1990):

"The policy for requiring a contemporaneous objection is to minimize the incentive for sandbagging in hopes of an acquittal and then, after an unfavorable verdict, challenge the selection of the jury which convicted."

Third, Appellant claimed in the post-conviction proceeding that her lawyers rendered ineffective assistance in failing to challenge Woodworth and Royal for cause. As we shall explain more fully when we reach appeal 21163, the motion court rejected that claim. Appellant does not, in appeal 21163, attack the motion court's rejection of the ineffective assistance claim regarding counsels' failure to challenge Woodworth; Appellant attacks only the motion court's rejection of the ineffective assistance claim regarding counsels' failure to challenge Royal.

For the reasons set forth *infra* in the segment of this opinion addressing appeal 21163, we hold the motion court's findings as to Royal are not clearly erroneous. Inasmuch as Appellant is receiving no post-conviction relief because her lawyers failed to challenge Woodworth and Royal for cause, it would be incongruous to hold that manifest injustice or a miscarriage of justice occurred as a result of the trial court's failure to remove Woodworth and Royal from the venire *sua sponte.* Appellant's first point is denied.

As reported earlier, Appellant's third point (the only other claim of error in appeal 20604) avers the trial court erred in allowing three State's witnesses to relate hearsay to the jury. Although the point does not challenge the sufficiency of the evidence to support the verdict, resolution of the point requires an account of the evidence. Viewed favorably to the verdict, *State v. Grim*, 854 S.W.2d 403, 411[5] (Mo. banc 1993), *cert. denied,* 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993), there was evidence from which a reasonable juror could have found the following facts.

On November 17, 1992 (two days before the murder), Appellant's ex-husband, Tim, was residing alone in a house on route JJ, two and a half miles south of highway 76 in McDonald County. About 3:30 p.m. that date (November 17), Dennis Johnson, Terry Banks and Matt Myers arrived at Tim's house in an old black Ford pickup. Tim was not there.

The trio broke into Tim's house through the back door and stole sundry items, one of which was a rifle resembling an "AK–47." A clip was in it.

Unknown to the trio, a neighbor of Tim, William Finan, saw the pickup enter Tim's driveway. Although Finan could not see what occurred at the back of Tim's house, Finan heard a "bang" which sounded like "kicking of a door or something." Using a telescope, Finan spotted the license number on the pickup and wrote it down.

The trio departed Tim's residence in the pickup.

Approximately two hours later, Finan saw Tim arrive home. Finan told Tim what he had seen. Over Appellant's hearsay objection, the trial court permitted Finan to testify that Tim remarked, "My ex-wife has come to clean me out." That ruling is the first of

the three complained of in Appellant's third point.

Finan informed Tim of the pickup's license number; Finan also furnished the number to law enforcement officials.

The next day (November 18), Edward Brickey, a cousin of Matt Myers, saw Myers, Terry Banks and Appellant. Myers and Banks showed Brickey the rifle they had stolen from Tim's residence. Brickey recalled that Myers had "a black truck."

Brickey saw Myers, Banks and Appellant again "about midday" the following day (November 19). Myers, Banks and Appellant asked Brickey to let them use a light blue 1978 "Trans Am" he was driving. Brickey agreed. When the trio entered the vehicle, they had the rifle Brickey had seen the previous day.

Brickey did not see the vehicle again until 11:00 a.m. the ensuing day (November 20). At that time, it was parked, unoccupied, at the home of Myers's father.

Meanwhile, about 2:55 p.m. November 19, Tim and his father, Melvin Eastburn, were at Melvin's place of employment. The telephone rang. Melvin picked it up. He recognized Appellant's voice; he handed the phone to Tim.

Melvin paid no attention to Tim's end of the conversation. However, over Appellant's hearsay objection, the trial court permitted Melvin to testify that after the phone call, Tim said Appellant was "coming down tonight and that ... she wanted to be alone ... they was going to watch a couple movies." That ruling is the second of the three complained of in Appellant's third point.

Dennis Johnson, the third member of the trio that stole the rifle from Tim's residence, resided in a trailer on "71 Alternate outside of Joplin" at the time of the events recounted in this opinion. Appellant and another woman also lived in the trailer. Matt Myers and Terry Banks lived in an apartment at Duenweg, a few miles from Joplin.

Johnson, Myers, Banks and Appellant were at the trailer on November 19. They departed in the borrowed Trans Am en route to a Joplin bar, ten to twelve miles distant.

During the journey, Johnson saw the stolen rifle. He recalled Banks was holding it.

Asked whether Appellant said anything about Tim on the way to the bar, Johnson replied that Appellant "made the comment that Tim had treated her badly in the past and that he had a lot of drugs and money and stuff there and that she wished that he was dead." Johnson's testimony continued:

"Q. Did the others respond to that?

A. Yes, they did.

Q. What did they say, if anything?

A. I don't remember which one said anything first, but the comment was made, 'Well, I will kill the ... son of a bitch.'

Q. What did the—was there any other comment?

A. Yes. The other said, 'Well, if you don't, I will.'

Q. ... Did the defendant say anything else about trying, about harming Tim Eastburn?

A. Yes. She said that on some occasions that she would stay at Tim's house, and she would sleep with Tim, and she would get money for clothing and et cetera, and that she could put, go into the house and have him positioned by a window to where they could get a clean shot at him.

Q. Was it your impression from this conversation that the defendant was attempting to talk the other two into assisting her to kill Tim Eastburn?

A. Yes, sir."

Upon arriving at the bar "about dusk," Johnson exited the Trans Am. He next saw Myers, Banks and Appellant about two hours later, but overheard no conversation between them regarding Tim.

While those events were unfolding, Tim was having dinner at a cafe. Rhonda Daniels, a cafe employee, had a conversation with Tim "between 6:30 and 7:00." Over Appellant's hearsay objection, the trial court permitted Daniels to testify that Tim said "Sheena had called and wanted him to be home alone." Daniels added: "He said he was going to take home two pieces of pie with

him, one for him and one for Sheena, and ... he had to get home, 'cause he thought maybe she'd be there after 9:00." That ruling is the third of the three complained of in Appellant's third point.

About 10:30 p.m. that date (November 19), Tim's neighbor, Finan, saw an old car, southbound, pause at Tim's driveway. The vehicle then proceeded down the road, turned around, came back north, and extinguished its lights.

Finan saw Tim's porch light illuminate. Ten or fifteen seconds later, the light "went back off."

Some five minutes after the car lights went off, Finan heard a gunshot. A short time later, he heard a "muffled noise" from Tim's house. Finan then heard voices but could not understand the words. After that, he heard the car start.

It is inferable from the record that Finan telephoned the McDonald County sheriff's office.

Deputy Sheriff Mathis and another officer arrived at Tim's house about 11:12 p.m. Mathis observed a broken window in the back of the house and footprints on the back porch steps. He also saw a spent shell casing on one step.

Mathis then went to the front door, looked in, and saw Tim on the floor. Mathis kicked the door in, entered the house, and determined Tim was dead.

Miles Parks, a major case investigator for the Missouri State Highway Patrol, was called to the scene, arriving about an hour after Mathis. Parks saw the broken rear window and observed that a straight line could be projected from the window, across Tim's body, to a hole in the kitchen wall where a bullet was embedded. Wounds on Tim's body and spatters of blood in the vicinity of the body led Parks to conclude that Tim had been shot with a "high-speed-velocity bullet," probably from a rifle.

About 3:30 a.m. November 20 (some five hours after the murder), Parks went to the Joplin Police Department. Appellant was there with her mother. Parks avowed his purpose in going there was twofold: to advise Appellant that her ex-husband had been killed and to find out what she knew about it.

Parks told Appellant that Tim had been murdered in his home. Appellant screamed, fell to the floor, and cried briefly. After Appellant ceased crying, she told Parks she had called Tim "earlier that afternoon" and he had indicated he "had to make a run to Arkansas that evening." Appellant also told Parks she had last seen Tim several days earlier at his residence, where she had shot an AK–47 he owned. Appellant stated she knew nothing about the murder.

Later that day (November 20), Parks was notified that Appellant's mother had informed the sheriff's department in Pineville that Appellant was present when the murder occurred. Parks went to the prosecutor's office in Pineville, arriving about 2:30 p.m. Appellant was there.

Parks advised Appellant of her "Miranda rights." [4] Appellant told Parks that when she phoned Tim the previous afternoon, he informed her that his house had been burglarized two days earlier and his AK–47 had been stolen. Appellant also told Parks that during her phone conversation with Tim, he stated a neighbor had gotten the license number from the pickup used in the burglary, and that the number checked to Richard Myers of Webb City. When Tim told her that, she realized Terry Banks and Matt Myers had burglarized Tim's home.

Additionally, Appellant told Parks that Banks and Myers were present when she phoned Tim; they overheard the conversation. Realizing the pickup had been identified, the trio became frantic and decided they would "dump" it.

Appellant revealed to Parks that the trio drove the pickup to "an old mining area" on the northeast side of Webb City, where they pushed it into "a strip pit, a large body of water." From there, they walked to Edward Brickey's residence and borrowed the Trans Am.

Appellant told Parks that she, Banks and Myers then went to a bar in Joplin, and

---

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

thereafter she drove to Tim's residence, accompanied by Banks and Myers. Upon arriving, Appellant exited the car at the driveway; Banks and Myers drove a short distance south and parked.

Continuing her narrative, Appellant told Parks she entered Tim's residence through the front door. Tim was inside, alone. They began watching television and drank beer. Appellant asked Tim if he would take her for a motorcycle ride. She wanted to get him out of the house. Tim refused, as it was late and raining outside.

Then, said Appellant, she and Tim went to the bedroom, where she saw his billfold on a dresser. From there, they went to the kitchen. Tim leaned across the sink island and kissed her. When he leaned back, the gun went off.

Describing what occurred next, Appellant told Parks that Tim fell to the floor. She took his hand and talked briefly with him. Myers and Banks were on the back porch; Banks was yelling at Appellant to get Tim's billfold. She went to the bedroom, got the billfold, exited the house through the back door, and threw the billfold to Banks.

At that time, Myers was holding the rifle. Appellant and Banks began running from the house. Myers said he was concerned that Tim was still alive. Myers "went in to finish him." As Appellant and Banks were running, Appellant heard one shot.

The trio proceeded to the car on foot, put the rifle in the trunk, and entered the car. Appellant drove from the scene.

Appellant told Parks the trio went to the trailer where she lived. There, she got a change of clothes. Then, the trio went to the Duenweg apartment where Myers and Banks resided. Myers got out there. Appellant and Banks went to a nearby truck line where Appellant's grandfather was employed. Appellant talked with her grandfather about twenty minutes.

Appellant and Banks returned to the apartment, where Appellant took a bath and washed blood from a sock she had been carrying. About an hour later, Appellant called her mother.

When Parks ended the interview with Appellant, Parks arranged for her to accompany him to the murder scene. They went there the following morning (November 21). Appellant "reenacted" her movements and repeated her previous account of the incident.

That same morning (November 21), a pathologist performed an autopsy on Tim's body. The autopsy revealed Tim had been shot twice. One bullet entered "the left posterior shoulder," passed through the spine, severed the spinal cord, and exited the right side of the neck. The wound caused instant paralysis from the neck down and would have been fatal.

The second bullet entered Tim's head above the right ear and exited around the left ear. This was a "contact" wound, i.e., the gun barrel "had been held tight against the skin." This wound was instantly fatal.

Parks talked with Appellant again about 8:00 p.m. November 22. This conversation occurred at the Jasper County sheriff's office. Parks again advised Appellant of her Miranda rights.

Parks asked Appellant about a dog that had been discovered during the crime scene search. Appellant told Parks that Tim had gone outside the house and gotten the dog from the basement. Inasmuch as the basement entrance is near the back porch, Parks asked Appellant why Tim did not see Myers and Banks on the porch.

Appellant then said Tim didn't go to the back of the house, he went to the driveway side and called the dog. When the dog came, Appellant and Tim went back inside.

Parks told Appellant he found that explanation unusual. Appellant then said it did not happen that way. Appellant stated she went to the rear of the house and got the dog from the basement. Parks asked Appellant whether she saw Myers and Banks on the back porch. Appellant acknowledged she saw them there with the rifle. Appellant added that she motioned to them with one finger, like "just give me one more minute."

Appellant told Parks she reentered the house and eventually positioned herself behind the kitchen sink, where she was situated when Tim was shot. Additionally, Appellant

told Parks she did not know Banks and Myers would shoot Tim. Appellant explained she thought that if she could get Tim to take her for a motorcycle ride, Myers and Banks could put the rifle back in the house and "take the money or dope while they were inside."

Officers recovered the rifle from a water-filled mine pit near Webb City. The clip was in position and contained several rounds. A round was in the firing chamber and the safety was off.

The pickup was found submerged in a larger pit nearby.

A ballistics expert connected the rifle to Tim's murder.

As noted earlier in this opinion, Appellant testified at trial. She revealed she met Banks for the first time in early November, 1992, at "Spookies Pool Hall" in Joplin. She liked him a lot and commenced a sexual relationship with him. On one occasion, she had some photographs made and put the name "Sheena Banks" on the film rolls. Appellant described Myers as Banks's "best friend."

Appellant told the jury she knew nothing about the burglary of Tim's home until her mother informed her of it by telephone on the afternoon of November 19. Appellant testified she immediately phoned Tim. Asked what she remembered about that conversation, Appellant answered: "I remember telling him that I would be down and that, asked him about his break-in in his house. . . . "

Appellant then testified about the events at Tim's home at the time of the murder. Her testimony paralleled the account she had given Parks on November 22. Appellant avowed she wanted Tim to take her to her mother's so Myers and Banks could "try to find drugs and more money and just leave the gun." Appellant insisted she did not intend that Tim be shot. According to Appellant, Banks was "jealous" of Tim.

Appellant's third point reads:

"The trial court erred in overruling Appellant's objections and in admitting hearsay testimony of State's witnesses William Finan, Melvin Eastburn, and Rhonda Dan-iels regarding statements made by Tim Eastburn, in violation of Appellant's rights to a fair trial, due process of law, and to confront and cross-examine the witnesses against her . . . in that the hearsay testimony was inadmissible, because it did not reflect Tim Eastburn's state of mind and was not relevant, and the testimony was highly prejudicial, because the State used the testimony as substantive evidence on the element of deliberation."

We first consider Finan's testimony. The argument following Appellant's third point specifies that the testimony about which she complains is the segment where Finan quoted Tim as saying, "My ex-wife has come to clean me out." Appellant argues that Tim's belief was not relevant to any issue, and the testimony was prejudicial because it linked her to the burglary.

In *State v. Boliek*, 706 S.W.2d 847 (Mo. banc 1986), *cert. denied*, 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986), the accused was convicted of murder. 706 S.W.2d at 848. On appeal, he maintained the trial court erred in allowing two witnesses to testify that a few days before the murder, the victim stated she feared the accused was going to kill her. *Id.* at 850. The Supreme Court of Missouri held:

"The general rule is that such statements of a declarant's present mental condition made out of court are excepted from the hearsay ban. Ordinarily, however, such statements are not admitted except in limited situations when they are relevant and the relevancy outweighs their prejudicial effect. Trial courts are in the best position to determine the probativeness and prejudicial effect of the evidence."

*Id.* (citations omitted).

The "state of mind" exception to the hearsay rule was an issue on appeal in *State v. Post*, 901 S.W.2d 231 (Mo.App. E.D.1995), another murder case. There, the appellate court emphasized that to be admissible, a deceased's state of mind declaration must be relevant. *Id.* at 235[8]. The opinion cited *State v. Singh*, 586 S.W.2d 410 (Mo.App. S.D.1979), which held such evidence admissible where it rebutted the accused's claim of

self-defense and accidental death. *Id.* at 419[15]. *Post,* 901 S.W.2d at 235–36.

In *Post,* the victim (the accused's wife) drowned in a bathtub. *Id.* at 233. The accused denied involvement in the death and denied he was present when the incident occurred. *Id.* at 236. Witnesses testified they had heard the victim say she wanted to divorce the accused. *Id.* at 235. The appellate court held this testimony inadmissible under the "state of mind" exception because the victim's attitude toward the accused was irrelevant to whether he caused her death. *Id.* at 236.

In the instant case, the State argues that Tim's statement to Finan was admissible under the "accident" provision recognized in *Singh.* 586 S.W.2d at 419[15]. The State asserts Tim's statement indicated a bad relationship between him and Appellant, and thus rebutted Appellant's testimony that she did not intend that Tim be shot.

We need not—and do not—decide whether Tim's statement to Finan was admissible. That is because we find the statement did not prejudice Appellant.

■ In addressing alleged trial court error, an appellate court reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the accused of a fair trial. *State v. Tokar,* 918 S.W.2d 753, 761[1] (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

■ Finan's testimony that Tim said, "My ex-wife has come to clean me out," was not prejudicial to Appellant for two reasons.

First, the testimony demonstrated only a suspicion by Tim that Appellant was involved in the burglary. The State's uncontradicted evidence was that the burglary was committed by Johnson, Banks and Myers. There was no evidence that Appellant had any role in the burglary. Appellant's testimony that she did not learn of the burglary until two days after it occurred was uncontradicted. Consequently, at worst the testimony demon-

strated merely that in Tim's opinion, Appellant was someone who would burglarize his residence.

Second, Tim's opinion of Appellant was confirmed by Appellant's testimony at trial. Appellant solemnly told the jury she went to Tim's residence with Banks and Myers to lure Tim away from the house so Banks and Myers could enter to steal drugs and money (and leave the rifle). Any possible prejudice to Appellant from Finan's testimony about Tim's statement vanished when Appellant gave that testimony.

■ The testimony of Melvin Eastburn and Rhonda Daniels about which Appellant complains is their testimony that Tim told them Appellant was coming down to his home on the fatal night and wanted him to be alone. Appellant asserts this testimony was inadmissible in that it was "hearsay within hearsay" and pertained to *her* state of mind, not Tim's. Appellant argues the testimony was prejudicial in that it allowed the jury to find the elements of deliberation and premeditation.

We need not, in this opinion, grapple with the intricacies of "hearsay within hearsay," also characterized as "double hearsay" in *State v. Reagan,* 654 S.W.2d 636, 639 (Mo. App. E.D.1983). A scholarly discussion of the subject appears there. *Id.* at 639–40.

■ In the instant case, Appellant twice admitted to Parks on November 20 that she had phoned Tim the preceding afternoon (the call about which Melvin Eastburn and Daniels testified). Parks told the jury about those admissions by Appellant. If evidence is improperly admitted, but other evidence before the court establishes essentially the same facts, there is no prejudice to the accused and no reversible error. *State v. Zagorski,* 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982).

Furthermore, Appellant, in her own testimony to the jury, admitted phoning Tim on the fatal day and telling him she "would be down." [5] Reversible error cannot be predicated upon the admission of evidence which

---

5. Although Appellant did not testify that she told Tim to be alone, the jury could readily infer from Appellant's testimony about the scheme to lure Tim from his home that she planned on him being alone.

the accused later confirms by his own testimony. *State v. Sanders,* 473 S.W.2d 700, 703–04[2] (Mo.1971); *State v. Holland,* 781 S.W.2d 808, 811[4] (Mo.App. E.D.1989).

Appellant's third point is denied.

Judgment affirmed.

### Appeal 21163

Appellant's second point relied on—the sole point presented in this appeal—reads:

"The motion court clearly erred in denying Appellant's ... motion for postconviction relief, because Appellant established that trial counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under the same or similar circumstances, in violation of Appellant's rights to due process of law and effective assistance of counsel ... in that counsel failed to move to strike for cause venireperson ... Royal, who said she expected the defense to prove Appellant's innocence, because counsel's inaction denied Appellant a fair and impartial jury."

It will be recalled from the segment of this opinion denying Appellant's first point that venire member Royal was one of the two prospective jurors Appellant maintained the trial court should have removed from the venire *sua sponte.* Some of the voir dire dialogue between Royal and Assistant Defender is quoted in that part of the opinion.

Appellant commenced the post-conviction proceeding by filing a pro se motion. Pursuant to Rule 29.15(e), the motion court appointed a lawyer ("Motion Counsel") to represent Appellant. Motion Counsel filed an amended motion for Appellant.

One allegation in the amended motion was that Defender and Assistant Defender rendered ineffective assistance in failing to challenge venire members Woodworth and Royal for cause. The motion averred: (1) Defender and Assistant Defender "had no reasonable strategic reason" for failing to challenge Woodworth and Royal, (2) because Appellant was required to use the majority of her peremptory challenges on venire members who should have been stricken for cause, Appellant was unable to strike Woodworth and Royal, and (3) Appellant was thereby prejudiced because she was deprived of a jury of fair and impartial jurors.

In addition to the dialogue between venire member Royal and Assistant Defender quoted earlier, another exchange between them is pertinent to Appellant's second point. The exchange began when Assistant Defender told the venire:

"We Believe there's going to be some testimony about Sheena's relationship with Tim Eastburn in this case. That relationship was punctuated by a lot of fighting and bitterness. Is there anybody that has any close friends or relatives, or perhaps you yourself, went through a bitter divorce or a break-up?

. . . .

Venireman Royal: I went through a real bad divorce.

[Assistant Defender]: How long ago was that, ma'am?

Venireman Royal: Three years.

[Assistant Defender]: It was three years? Still got, have feelings about that?

Venireman Royal: Just that I'd like to see him dead.

[Assistant Defender]: Okay.

[Prosecutor]: I didn't hear the answer. What did you say?

[Assistant Defender]: She said, 'I'd like to see him dead.' That's resolved, though? You are divorced, right?

Venireman Royal: Oh, yes.

[Assistant Defender]: But you feel that you could set aside your feelings and—

Venireman Royal: Yes.

[Assistant Defender]:—sit and listen to the evidence in this case?

Venireman Royal: Yeah. He's the only one I don't like.

[Assistant Defender]: Okay. You wouldn't be affected by, by that in this case?

Venireman Royal: No."

Motion Counsel called Assistant Defender as a witness at the hearing in the motion court. Assistant Defender's testimony included this:

"Q During the voir dire do you recall asking the jury panel whether anyone would expect the defense to prove Sheena Eastburn's innocence?

A Yes, ma'am.

Q Do you also recall that a Mr. Scott Woodworth responded, yes, he would expect the defendant to prove her innocence?

A Yes, ma'am.

Q And do you recall that a Ms. Alta Royal responded that she also would expect the defense to prove Ms. Eastburn's innocence?

A I don't have a specific recollection, but based on the record, yes.

. . . .

Q Would you agree that those responses by Mr. Woodworth and Ms. Royal provided a basis for you to move to strike them for cause?

A Yes, ma'am.

Q Did you, in fact, move to strike for cause several of the panel members who said that they would expect the defense to prove Ms. Eastburn's innocence, or they would expect her to testify?

A Yes, ma'am.

Q So was it your intent or strategy to move to strike for cause all of the individuals who responded that they expected the defense to prove her innocence or that they expected Ms. Eastburn to testify?

A That was my original intent.

. . . .

Q Can you recall why you did not move to strike for cause Mr. Woodworth?

A [Defender] and I conferred, and we thought that in view of the fact that the Court was not going to strike any of the other jurors that we had attempted to strike for cause on the same basis, we felt like he would be, considering all of the other options, he would be a fairly good juror for us.

Q And can you recall why you did not move to strike for cause Ms. Royal?

A I don't have a specific recollection of that. [Defender] and I have had conversations, but I don't have the specific recollection of that.

Q Do you recall that at one point Ms. Royal stated that she had been through a divorce, and said something to the effect that she would like to see her exhusband dead?

A I recall that was her statement.

Q Can you recall in what manner she said that she would like to see her exhusband dead?

A I took it to be jocular or flippant.

Q Did her statement that she would like to see her exhusband dead, did that in any way influence your decision whether to move to strike her for cause?

A I can't say.

Q You don't recall that?

A I don't recall that alone.

. . . .

Q Am I correct in saying that based on your testimony this morning, that you either did not have a strategic reason or you cannot recall a strategic reason for not moving to strike Ms. Royal?

A I cannot recall.

. . . .

Q You had also mentioned that the Court had not sustained several of the challenges for cause that you made when you'd asked to remove venire persons that expected Sheena to testify or prove her innocence. Was that a strategic factor in not … [moving] to strike … ?

A Well, as I said before, as far as Mr. Woodworth goes, I felt like he was a juror that even though he had made that statement early on in the voir dire, that he still might be favorable to the defense.

Q What about with respect to Ms. Royal?

A I can't recall. [Defender] might be able to tell you, but I can't recall.

. . . .

Q You and [Defender], I assume, consulted among yourselves or between yourselves, and took notes, and compared your notes in deciding who to request strikes for cause?

A Yes, sir.

. . . .

Q  And here today, you're not telling the Court that you did not have a reason to strike [Ms. Royal], you are just saying if you did, you don't recall what that reason was?

A  Yes, sir."

Appellant did not testify in the motion court, and neither she nor the State presented Defender as a witness there.

The motion court's findings included these:

"15.  The testimony at the evidentiary hearing from [Assistant Defender] was that counsel voluntarily chose not to move to strike venireperson Woodworth for cause because he had a strategic reason for keeping Woodworth on the jury.... Counsel testified that he did not recall whether he had a specific strategic reason for not moving to strike venireperson Royal and that if he had a reason, he does not remember what it was.  Counsel stated that he had discussed with his co-counsel which individuals to strike, but that he did not recall whether they specifically discussed venireperson Royal.

16.  Movant has failed to overcome the presumption that counsel's conduct was reasonable trial strategy.  In fact, movant has succeeded in proving that counsel had a valid strategic reason for not striking venireperson Woodworth....  [C]ounsel's failure to recall whether he had a strategic reason for striking venireperson Royal is not sufficient to overcome the presumption that counsel's conduct was sound trial strategy."

Appellant's second point makes it clear that her claim of ineffective assistance is based solely on her lawyers' failure to challenge venire member Royal for cause.  Appellant maintains Royal demonstrated she could not presume Appellant innocent unless and until the State proved her guilty beyond a reasonable doubt, and that Defender and Assistant Defender "did not have a strategic reason for not moving to strike Ms. Royal for cause."  Citing *State v. McKee*, 826 S.W.2d 26 (Mo.App. W.D.1992), and *Presley v. State*, 750 S.W.2d 602 (Mo.App. S.D.1988), *cert. denied*, 488 U.S. 975, 109 S.Ct. 514, 102 L.Ed.2d 549 (1988), Appellant asserts, "The failure to challenge for cause a venireperson who admits to a prejudice against the defendant is ineffectiveness absent an acceptable explanation."

*McKee* and *Presley*, while pertinent to Appellant's second point, are not controlling. In each of those cases, the accused's lawyer became confused about which venire member gave responses indicating prejudice against the accused.  *McKee*, 826 S.W.2d at 27–28; *Presley*, 750 S.W.2d at 604–05.  Consequently, the accused's lawyer did not challenge venire members who were susceptible to challenge.  In *McKee*, the appellate court held the record demonstrated that the failure of the accused's lawyer to challenge the prejudiced venire members was not a matter of trial strategy.  826 S.W.2d at 28.  In *Presley*, the motion court found the accused's lawyer mistakenly challenged the wrong venire member, leaving the prejudiced member unchallenged.  750 S.W.2d at 604–05.  The appellate court upheld that ruling.

In contrast, Assistant Defender in the instant case did not confuse the responses of Royal with responses of any other venire member.  Assistant Defender simply failed to recall whether he or Defender had a reason for failing to challenge Royal for cause.

Obviously mindful that it was Appellant's burden to prove her claim of ineffective assistance of counsel by a preponderance of the evidence, Rule 29.15(h); *Clemmons v. State*, 795 S.W.2d 414, 416[2] (Mo.App. E.D.1990), *cert. denied*, 500 U.S. 907, 111 S.Ct. 1689, 114 L.Ed.2d 83 (1991), and that Appellant was required to overcome the presumption that her lawyers' challenged acts or omissions were sound trial strategy, *State v. Stepter*, 794 S.W.2d 649, 656[17] (Mo. banc 1990), the motion court held Appellant proved only that Assistant Defender failed to recall whether he had a strategic reason for failing to challenge Royal for cause.

To reverse the motion court, we would have to hold that where an accused's lawyer cannot recall, long after trial, whether he had a strategic reason for failing to challenge a venire member for cause, the accused is automatically entitled to a nullification of the conviction because of ineffective assistance of

counsel, even where, as here, the record arguably demonstrates a plausible reason for failure to challenge.

It will be remembered that in the second voir dire exchange between venire member Royal and Assistant Defender, quoted earlier, Royal revealed she had gone through a bad divorce three years earlier. Asked whether she still had feelings about it, Royal announced she would like to see her exhusband dead. Although Assistant Defender treated the latter remark as flippant, it was evident that Royal bore enmity toward her former spouse.

The State, through Johnson, presented evidence that Appellant said Tim had treated her badly and she wished he was dead. It is reasonable to infer that Appellant's lawyers anticipated that evidence and thought Royal could be a favorable juror. Assistant Defender obviously believed it would be helpful in jury selection to know whether any venire member had been through a "bitter divorce"; otherwise, he would not have asked the question that produced Royal's response.

■ Appellate review of a motion court's denial of post-conviction relief is limited to a determination of whether that court's findings and conclusions are clearly erroneous. Rule 29.15(j); *Sidebottom v. State,* 781 S.W.2d 791, 794–95 (Mo. banc 1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). Findings and conclusions are deemed clearly erroneous only if a full review of the record leaves the appellate court with the definite and firm impression that a mistake has been made. *Id.,* 781 S.W.2d at 795.

■ We have no such impression from the record here. The outcome in the motion court hinged on whether Assistant Defender's failure to recall whether he and Defender had a strategic reason for failing to challenge venire member Royal for cause was sufficient to overcome the presumption that the failure to challenge was sound trial strategy. The motion court found Assistant Defender's absence of memory insufficient to rebut the presumption. Given Royal's comments about her divorce during voir dire, we cannot brand the motion court's findings clearly erroneous.

The order of the motion court is affirmed.

SHRUM, J., and MONTGOMERY, C.J., concur.